# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| DEMETRIUS CAREY, | ) |
| Plaintiff, | ) |
| v. | ) 2:19-cv-01636-LSC-SGC |
| CORBIN TUNSTALL, | ) |
| Defendant. | ) |

## MEMORANDUM OF OPINION

Pursuant to Federal Rule of Civil Procedure 52(a)(1), this case is before the Court for findings of fact and conclusions of law following a bench trial conducted on January 13, 2023. For the reasons that follow, the Court will enter judgment in favor of Defendant Corbin Tunstall and against Plaintiff Demetrius Carey.

**I.      Procedural Background**

On October 7, 2019, the plaintiff, Demetrius Carey ("Carey"), filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights during his incarceration at the William E. Donaldson Correctional Facility in Bessemer, Alabama. The plaintiff named as defendants Correctional Officer Corbin Tunstall ("Officer Tunstall"), Lieutenant Michael Wheat, Alabama Department of Corrections ("ADOC") Inspector General Mark Fassl, and ADOC Psychologist

David Tytell. Carey sought compensatory and punitive damages, as well as injunctive relief.

In accordance with the usual practices of this court and 28 U.S.C. § 636(b)(1), the complaint was referred to a magistrate judge for a preliminary report and recommendation. The magistrate judge entered a report and recommendation on June 10, 2021, recommending that summary judgment be granted in the defendants' favor on all of Carey's claims against all defendants, except Carey's claim for excessive force against Officer Tunstall. Carey did not file objections to the report and recommendation. This Court adopted and accepted the report and recommendation, dismissing all of Carey's claims except his claim that Officer Tunstall violated his right to be free from excessive force.

Carey obtained counsel, and a bench trial was held on the excessive force claim on January 13, 2023, before the undersigned.

## II. Factual Findings

At the bench trial, the Court heard testimony from Carey, Officer Tunstall, two of Carey's fellow inmates, and an investigator with the ADOC. The following facts are derived from the trial testimony and other evidence.

The events giving rise to Carey's excessive force claim occurred on the afternoon of January 4, 2019, at Donaldson Correctional Facility, inside the

"RSTU" dorm. There are 12 cells in this dorm located along one wall. Cells one through five are deemed crisis cells, housing inmates who are considered a suicide risk. The remainder of the cells house inmates who were previously in crisis cells but who are being transitioned out of the RSTU dorm into other dorms within the prison or elsewhere.

On January 4, 2019, Carey was inside cell 12 in the RSTU dorm. Officer Tunstall was roving the dorm, conducting a cleanup, along with an inmate, Stanley Chatman, who served as a trustee or runner who occasionally aided the correctional officers with chores and cleaning. Another officer, Ms. Hackworth, was also roving the dorm as an observer, meaning that she observed inmates on suicide watch in the crisis cells. Another officer, Ms. Terrell, was also either in the dorm or nearby.

According to Carey's trial testimony, he and Stanley Chatman were having a verbal altercation when Officer Tunstall came to Carey's cell to take him somewhere. Carey testified that he stuck his hands through the tray slot in his cell door so that Officer Tunstall could place handcuffs on him so that he could leave his cell. Carey testified that at that point Officer Tunstall sprayed him with his can of chemical spray without warning. Carey stated that he attempted to grab the can of chemical spray away from Officer Tunstall. He further stated that the chemical spray hit him in the face and that some got on his shirt and pants. Carey stated that as

Officer Tunstall was wrestling the can of chemical spray away from Carey, Officer Tunstall closed Carey's left pinky finger in the tray slot of his cell door. Carey testified that as he was crying out in pain, Officer Tunstall smiled, laughed, walked away, and told him to kill himself and that he didn't care. Carey stated that he was able to free his own finger from the tray slot. He also stated that the chemical agent that had gotten on his shirt made him cold, so he removed his shirt. Because his left pinky finger was bleeding and was lacerated at the base of the nail, Ms. Hackworth and Ms. Terrell escorted him to the prison infirmary.

During cross examination, Carey was presented with his own prior statements where he had described the incident somewhat differently. For example, in his complaint, he alleged that the incident began when he yelled at Officer Tunstall from his cell, asking if he could use the phone to call his mother. He alleged that Officer Tunstall approached his cell door and told him to "cuff up" in order to take him out of his cell. He alleged that when he placed his hands in the tray slot to be handcuffed, Officer Tunstall "abruptly and aggressively" grabbed his hands and sprayed the chemical agent. He alleged that after Officer Tunstall had closed his finger in the tray slot, while his finger was still stuck in the tray slot, Officer Tunstall smiled and said "so what?" as he walked away. Carey further alleged that he began to beat on his cell door with his one free hand and both of his feet and screamed for help. He alleged

that his finger was stuck until Ms. Terrell approached his cell and freed his finger from the tray slot. At trial, Carey admitted that this last statement made in his complaint was not true and that he was able to remove his finger from the tray slot himself. Carey was also shown during cross examination two statements: a handwritten statement that he was asked to write shortly after the incident, on the same day, and another statement that he wrote ten days later. In these statements, Carey did not include many of these details, such as his allegation that Officer Tunstall told him to "cuff up."

According to Officer Tunstall's testimony, Carey did not ask him to use the phone or be transported anywhere. Officer Tunstall denied asking Carey to "cuff up" to indicate that he was going to take him anywhere. Officer Tunstall testified that while he was cleaning the RSTU dorm, Carey was yelling from inside cell 12, beating on his cell door, cursing, and being disruptive. Officer Tunstall stated that he told Carey to calm down, that they were cleaning the dorm, but that when they were finished cleaning he would get him out of his cell to see what his concern was. Officer Tunstall stated that he couldn't take Carey out of his cell at that time because they already had an inmate outside of a cell and out on the floor, Stanley Chatman, at that time. Officer Tunstall testified that Carey continued to curse, became irate, and threatened to beat his cell door down until he broke it. Officer Tunstall testified

that the cell doors were new, having been installed less than a month before, and he was concerned that it was possible that Carey would be able to break through the cell door. He testified that inmates had been able to break the glass out of the old doors that had recently been replaced and make knives with the glass.

Officer Tunstall testified that because Carey would not stop beating on the door and causing a disruption, he retrieved a key to cell 12 from Ms. Terrell, opened Carey's tray slot with his left hand, and attempted to spray his chemical agent inside Carey's cell through the tray slot with his right hand. He stated that the spray can malfunctioned, and nothing came out. Officer Tunstall further testified that Carey reached for the spray can through the tray slot, so Tunstall quickly pulled his hand back that was holding the spray and closed the tray slot with his other hand simultaneously. Tunstall stated that Carey started crying, "my hand, my hand" and that he saw a look of distress on Carey's face. At that point Tunstall saw that Carey's finger was caught in the tray slot, so he opened the tray slot and let Carey pull his finger out. Officer Tunstall stated that he did not know that he was going to close Carey's finger in the tray slot until he had already done it, and that he did not intend to harm Carey when he quickly closed the tray slot. Tunstall stated that if Carey had been able to wrestle the chemical spray can from him, then he would have had to get a team together to go in and get it back from him, and that he had never had an inmate

6

reach for his spray before. Tunstall stated that he then returned the key to cell 12 to Ms. Terrell, and because she had handcuffs, and he didn't, that Ms. Terrell handcuffed Carey and transported him to the infirmary.

Photographs of Carey were taken by prison officials immediately after the incident. There is no physical indication that Carey was sprayed with a chemical agent. For example, neither Carey's eyes nor his skin appears to be irritated or red. Officer Tunstall testified that in his personal experience, the chemical agent is an orange color that would be visible on a white prison uniform. Carey is wearing white pants in the photographs that do not show any visible orange markings.

After receiving several numbing shots at the prison infirmary, Carey was transported to UAB hospital in Birmingham, where the top portion of his left pinky finger was amputated. Upon returning to the prison, Carey continued to receive follow up care, including pain medication. Carey experienced pain at a level of 8 on a scale of one to 10, and he states that his finger still locks up on him.

Carey received a disciplinary writeup for failure to obey a direct order from an ADOC official, which stated that he disobeyed Officer Tunstall when he told him to stop beating on the cell door.

An investigator with ADOC later investigated the incident, including interviewing Carey. After the interview, the investigator reached the conclusion that

Officer Tunstall did not intend to commit an assault against Carey, so the result of the investigation was that a crime was not committed by Officer Tunstall.

Officer Tunstall was not criminally charged or disciplined for this incident. He voluntarily resigned from ADOC on February 7, 2022, after being placed on leave from October 2021 through February 2022, due to an incident where an inmate died under his supervision.

## III. Conclusions of Law

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. The Eighth Amendment's proscription of cruel and unusual punishment governs prison officials' use of force against convicted inmates. *Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999). In considering an Eighth Amendment excessive force claim, courts consider both a subjective and objective component: (1) whether the "officials act[ed] with a sufficiently culpable state of mind," and (2) "if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotations omitted).

Under the subjective prong of the analysis of excessive force claims, the use of force is deemed legitimate in a custodial setting if it is "applied in a good faith effort to maintain or restore discipline" and not "maliciously or sadistically to cause

harm." *Sears v. Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019) (quoting *Hudson*, 503 U.S. at 7). In determining whether force was used "maliciously and sadistically," a court considers: (1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the extent of the injury inflicted upon the prisoner; (4) the extent of the threat to the safety of staff an inmates; and (5) any efforts made to temper the severity of a forceful response. *Id.* (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). "Not only that, but [courts] must also give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Id.* (quoting *Cockrell*, 510 F.3d at 1311). "The focus of our Eighth Amendment inquiry is on the nature of the force applied, not on the extent of the injury inflicted." *Id.* (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37–38 (2010)).

Applying the factors from *Hudson*, it is clear that Officer Tunstall did not use force "maliciously and sadistically" for the very purpose of causing harm. *See Hudson*, 503 U.S. at 7. Carey suffered an amputation of part of his finger, which certainly qualifies as more than a *de minimus* injury. However, there is no evidence showing that the closing of the tray slot on Carey's finger was anything but accidental. *See Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989) (holding that there is no Fourth Amendment violation when there is no intention to apply force).

9

Although Officer Tunstall arguably could have waited to see whether Carey would remove his hand from the tray slot completely, his action in allowing the tray slot to close on Carey's finger was at most negligent. *See Campbell v. Sikes*, 169 F.3d 1353, 1374 (11th Cir. 1999) ("To establish an Eighth Amendment claim for excessive force [] Plaintiff must meet an intent requirement more stringent than [] deliberate-indifference . . . . [F]orce does not violate the Eighth Amendment merely because it is unreasonable or unnecessary.").

Further, the other *Hudson* factors weigh against a finding that Officer Tunstall intended to cause harm to Carey. The Court finds credible Officer Tunstall's testimony that he attempted to spray chemical agent into Carey's cell because Carey was causing a disruption and threatening to break his cell door down, and the Court does not find credible Carey's testimony that Tunstall sprayed him without provocation or warning. It is clear that Officer Tunstall's attempted use of chemical spray was a relatively minor use of force in response to Carey's failure to obey repeated direct orders. *See Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) (explaining that prison officials cannot avoid using force and simply leave a prisoner alone after failing to obey a particular order as "experience and common sense establish that a prison cannot be operated in such a way"); *West v. Sconyers*, 2010 WL 4822084, *7 (M.D. Ala. Nov. 3, 2010) ("West is not at liberty to ignore or

10

disobey, without consequence, the lawful orders of his custodians or the rules and regulations of a jail. Strict adherence to rules and orders within a penal institution's walls are necessary for discipline, and even more importantly, for the safety and security of inmates, guards, and visitors alike."), report and recommendation adopted, 2010 WL 4823384 (M.D. Ala. Nov. 22, 2010). Officer Tunstall testified that he was concerned that Carey might break the door, which would threaten the safety of prison officials and other inmates, and Officer Tunstall stated that he directed Carey to stop beating on the door several times before attempting to discharge his spray.

Importantly, Carey was trying to wrestle the can of chemical spray out of Tunstall's hand when Tunstall swiftly removed his own hand and the can, thereby allowing the tray slot door to trap Carey's finger. Upon discovering that Carey's finger was trapped, Tunstall re-opened the tray slot so that Carey could free his finger and immediately sought the aid of another officer who had handcuffs and who could escort Carey to the infirmary. This is thus not a situation where accidental application of force was gratuitously prolonged. The Court simply does not find credible Carey's account that Officer Tunstall ignored his injury and advised him to "kill himself." Over time, Carey has provided contradictory and conflicting accounts of the events, such as whether Officer Tunstall indicated that he would

transport him outside of his cell and advised him to "cuff up," whether Officer Tunstall "abruptly and aggressively" grabbed his hands through the tray slot, and whether he was able to free his own finger or had to rely upon Ms. Terrell to free it.

In consideration of the testimony, the witnesses' credibility, and the documentary and photographic evidence presented at trial, the Court concludes that Officer Tunstall's attempt to discharge the chemical agent was reasonable, and the injury to Carey's finger was accidental. *See, e.g., Johnson v. Moody*, 206 F. App'x 880, 884 (11th Cir. 2006) (single incident where officer kicked tray door closed on plaintiff's finger held to be accidental and not excessive force); *Harris v. Coweta County*, 21 F.3d 388, 393 (11th Cir. 1994) ("Accidents, mistakes, [and] negligence . . . are not 'constitutional violations] merely because the victim is a prisoner.'"). The use of force was certainly not undertaken maliciously, sadistically, or wantonly in an effort to inflict pain. *Whitley*, 475 U.S. at 322. Accordingly, Carey is unable to meet his burden of establishing the subjective component of the excessive force claim.

## IV.   Conclusion

For the aforementioned reasons, the Court finds in favor of Defendant Corbin Tunstall and against Plaintiff Demetrius Carey. A separate order will be entered.

**DONE** and **ORDERED** on March 29, 2023.

_____
L. Scott Coogler
United States District Judge

160704